UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RAYMOND DONNELLY, O'TARA JOHNSON, and DANTE WILLIAMS, | § § § § | |
| *Plaintiffs*, | § | |
| v. | § § | Civil Action No. 3:20-CV-1106-X |
| ACADEMIC PARTNERSHIPS LLC, | § § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Defendant Academic Partnerships, LLC ("AP") terminated the employment of Plaintiffs Raymond Donnelly and O'Tara Johnson. Donnelly and Johnson sued AP for a host of discrimination claims, and AP now moves for summary judgment on all of those claims. [Doc. 77].

At the summary-judgment stage, evidence establishing a genuine dispute of material fact—not speculation, conjecture, wishful thinking, or outrage—dictates the outcome. After meticulously reviewing the evidence, the Court **GRANTS** summary judgment in favor of AP on all of Donnelly's and Johnson's claims.

Also before the Court is AP's motion to strike Donnelly and Johnson's response to AP's motion for summary judgment. [Doc. 93]. For the reasons explained below, the Court **GRANTS IN PART AND FINDS AS MOOT IN PART** the motion. Finally, Donnelly and Johnson move for sanctions against AP. [Doc. 103]. The Court **DENIES** that motion.

1

## I.  Background

AP "is a higher education service provider offering integrated university, marketing, and student services."[1]  Two of AP's former employees, Donnelly and Johnson, complain about AP's actions during their employment.

Donnelly, a black male, joined AP in 2014 as an Enrollment Specialist.  This role required him to facilitate student enrollment over the phone.  After about a year at AP, Donnelly unsuccessfully applied for a promotion to a Team Lead Generalist position.  The employees AP promoted to that position instead of Donnelly were both black.  About six months later, AP selected Donnelly for its Emerging Leaders program, which included training for future advancement in the company.  All five AP employees in the program were black, and all but Donnelly received promotions after completing the program.

About two years into his employment with AP, Donnelly received a Written Warning for being tardy to work seven times in a month.  Then, during a training session, Donnelly stated that he was "making a conscious decision not to follow" AP's Discussion Guide for conversations with students.[2]  The Discussion Guide helped AP employees "stay on task" and avoid violating Department of Education rules, which could cause AP to "be fined and sanctioned" and "lose funding."[3]  The next day, AP issued Donnelly a Final Written Warning for missing his application goals for two months in a row and specifically noted that he needed to follow the Discussion Guide.

---

[1] Doc. 79-2 at 232.

[2] *Id.* at 233 n.1.

[3] Doc. 78-3 at 134.

Over the next few months, Donnelly received three additional Verbal Warnings for tardiness, unprofessional conduct, and missing his application goal. In two of these warnings, and on various other occasions, AP admonished Donnelly that he needed to follow the Discussion Guide, which he had continued to disregard.

In his third year at AP, Donnelly met with supervisors and Human Resources ("HR") to discuss multiple co-worker complaints against him, including for "aggressive behavior," "derogatory comments," creating a "toxic" environment, and "missing [his] app[lication] goal."[4]  AP told Donnelly that further complaints "regarding [his] conduct/lack of professionalism in the work place" that AP found to be true could lead to his termination.[5]  After this meeting, Donnelly requested and received a meeting with HR. In his email requesting the meeting, Donnelly complained he felt "targeted" and said he would send specific examples, but he never did.[6]  AP did not investigate because Donnelly's complaints—none of which mentioned race—were duplicative of past complaints from Donnelly that AP had investigated and found lacking in substance.[7]

When AP began a career pathing program to help employees advance, Donnelly applied for a Senior Enrollment Specialist position, but AP did not consider him for the role because he was on active corrective action at the time, and AP's policy states that employees on active correction are ineligible for promotion.

---

[4] Doc. 78-1 at 143.

[5] *Id.*

[6] Doc. 79-2 at 236.

[7] Docs. 78-1 at 148; 79-2 at 236.

In August 2018, AP learned that Donnelly had been improperly contacting leads that AP had previously assigned to other Enrollment Specialists. Donnelly's supervisor advised Donnelly that this behavior violated AP's policy and could result in disciplinary action. The next month, AP placed Donnelly on a Performance Improvement Plan ("PIP") for continued performance failures. Donnelly acknowledged that this meant that any infractions in the next month could result in a Final Written Warning. Nevertheless, within that time Donnelly received a verbal warning for failing to meet his application goal and a Quality Assurance auto-failure after a call review (*i.e.*, a random review of one of his call recordings indicated noncompliance with, or failure to meet, AP's standards).

On October 2, 2018, AP issued Donnelly a Final Written Warning, meaning that he would be terminated for any violations within the next sixty days. Shortly thereafter, Donnelly auto-failed another Quality Assurance check. Then AP discovered, and Donnelly admitted, that Donnelly had continued to take leads from his co-workers in violation of AP's policy and previous warnings. As AP had previously instructed Donnelly and all other AP employees, this behavior constituted data manipulation, which "c[ould] be grounds for termination."[8]

AP's leadership met to discuss the future of Donnelly's employment. They reviewed documentation showing that he auto-failed 29% of his calls in comparison to an average auto-fail rate of 12% among all Enrollment Specialists. Based on Donnelly's data manipulation, past co-worker complaints, behavioral issues, and

---

[8] Doc. 78-2 at 2.

4

ongoing failure to follow the Discussion Guide after repeated warnings, Earl Frischkorn, AP's Senior Vice President of Enrollment & Retention Services, decided to terminate Donnelly's employment.  AP's Director of HR told Frischkorn that Donnelly was scheduled to meet with Tena Bracy, a Team Lead, and advised that HR would await the results of that meeting before signing off on Donnelly's termination.

Donnelly met with Bracy and voiced some complaints about AP.  Frischkorn reviewed Bracy's report of Donnelly's complaints about two weeks after deciding to terminate Donnelly.  The report did not mention race discrimination or Donnelly's race, of which Frischkorn was unaware at the time.  After reviewing Bracy's report, HR signed off on Frischkorn's decision to terminate Donnelly.

Johnson, a black female, started working at AP in November 2015.  A few months later, AP chose Johnson to lead its new Emerging Leaders program.  Less than a year into her employment, AP offered her a promotion to a Marketing Coordinator position, which she declined.  It then offered her a promotion to a Team Lead position, which she accepted.

In January 2017, Johnson applied for an Enrollment Manager position, which she was offered and accepted.  She received a pay increase, and, when she objected that it should have been higher based on what she'd heard from co-workers, she was informed the salary was non-negotiable.  One year later, AP promoted two male employees to Enrollment Manager, and Johnson learned that they had negotiated their salaries.  Johnson complained to Frischkorn, who investigated and informed her that, to address her concerns, AP would offer her a back-dated pay increase.

Johnson's supervisors repeatedly counseled her about improving her demeanor with her co-workers.  She accepted coaching and attended training sessions but still received some low ratings on a performance review addressing her leadership competencies.  Describing the feedback, Johnson said that her "passion can be taken for being a little aggressive" and "can really take over and make [her] seem . . . angry or upset."[9]  And she stated that she and her supervisor "had a "heated conversation" and that she would "yell at him."[10]

When AP launched its "career pathing" program to help employees advance, Johnson's performance reviews rendered her ineligible for some of the placements AP created.  AP promoted three employees to a new Senior Manager role without opening the new positions for applications and interviews.  She later applied for a Partner Support position, and her supervisors indicated their support and offered to help her prepare for interviews.  While that application was pending, Johnson asked to meet with HR about the Senior Manager role.  She claimed that one of the three candidates AP promoted, who is white, was unqualified.  HR told Johnson it would investigate this complaint.

The next month, an AP employee reported that Johnson had revealed confidential information about the impending termination of one of her subordinate co-workers.  AP investigated the complaint and interviewed Johnson, who denied the allegation.  After conducting multiple interviews, Johnson's supervisors and an HR

---

[9] Doc. 78-3 at 151.

[10] *Id.* at 152.

representative met with Frischkorn, who decided to issue Johnson a Final Written Warning for the breach of confidentiality.

When Johnson's supervisors issued her the Final Written Warning, they reported that Johnson reacted in an aggressive and combative manner, by yelling, leaning over the table, banging her hand on the table, and slamming the door. One supervisor reported that "she was very terrified," "felt threatened by Johnson's unprofessional behavior," and "thought Johnson was going to hit her during the meeting."[11]   Another supervisor corroborated that Johnson left the meeting and "confronted him in a very loud and unprofessional manner."[12] Johnson stated she got "mad" and "upset" and had to leave work.[13]

Johnson met with an HR representative and, after voicing some complaints about AP, admitted her conduct during the meeting was unprofessional. When Frischkorn learned about Johnson's behavior, he decided to terminate her employment because he "could not support a member of leadership engaging in such unprofessional conduct."[14]   At the time, Frischkorn was unaware of any complaints made by Johnson about AP's practices or work environment.

Donnelly and Johnson sued AP.[15]

---

[11] Doc. 79-2 at 229.

[12] *Id.*

[13] Doc. 78-3 at 160–61.

[14] Doc. 79-2 at 230.

[15] Another plaintiff, Dante Williams, sued AP as well.  The Court has since dismissed his claims with prejudice.  Doc. 60.

Donnelly alleges (1) race discrimination under Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), (2) retaliation under Section 1981, and (3) hostile work environment under Section 1981.[16]

Johnson alleges (1) race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), Section 1981, and the Texas Labor Code, (2) sex discrimination under Title VII and the Texas Labor Code, (3) retaliation under Title VII, Section 1981, and the Texas Labor Code, and (4) hostile work environment under Title VII, Section 1981, and the Texas Labor Code.[17]

## II.   Analysis

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18]   "[F]actual [disputes] are considered in the light most favorable to the nonmovant," and "[t]he substantive law will identify which facts are material."[19]

---

[16] Doc. 1 at 15–16.  Donnelly did not bring any Title VII claims. The Equal Employment Opportunity Commission charge alleged only age discrimination and retaliation, and never mentioned race.  Doc. 78-1 at 83.

[17] Doc. 1 at 13–17.  At the outset, the Court notes that Donnelly's and Johnson's various claims under Title VII, Section 1981, and the Texas Labor Code are all governed by the evidentiary framework courts use to adjudicate Title VII claims, so the Court will adhere to that standard throughout its analysis.  *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) ("When used as parallel causes of action, Title VII and [S]ection 1981 require the same proof to establish liability."); *Page v. U.S. Indus., Inc.*, 726 F.2d 1038, 1041 n.2 (5th Cir. 1984) ("[T]he elements of substantive claims of employment discrimination brought under § 1981 parallel those of claims brought under Title VII."); *Allen v. Radio One of Tex. II, L.L.C.*, 515 F. App'x 295, 297 (5th Cir. 2013) (per curiam) (noting that the Texas Labor Code's antidiscrimination provisions are "intended to correlate with Title VII" so "the same analysis is applied for each claim"); *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445–46 (Tex. 2004) (noting that the Texas Labor Code's antidiscrimination provisions are "modeled after federal law with the purpose of executing the policies set forth in Title VII," and thus, "federal case law may be cited as authority in cases relating to the Texas Act" (cleaned up)).

[18] FED. R. CIV. PROC. 56(a).

[19] *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996) (cleaned up).

The moving party must "demonstrate the absence" of genuine factual disputes "but need not *negate* the elements of the nonmovant's case."[20]

If the moving party satisfies its burden, the nonmoving party "must set forth specific facts showing that there is a genuine [dispute] for trial."[21]  The nonmoving party cannot satisfy its burden with "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[22]

"Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*[.]"[23]  The *McDonnell Douglas* framework operates in three steps: (1) a plaintiff must establish a prima facie case of discrimination; (2) if the plaintiff does so, "[t]he burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action"; and (3) if the employer can do so, the burden shifts back to the plaintiff to "prov[e] that the articulated reason is untrue and was given as a pretext for discrimination."[24]  As to the second step, the employer's burden "is one of production, not persuasion," and "it can involve no credibility assessment."[25]  Meeting this burden requires only that the

---

[20] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (cleaned up).

[21] *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968) (cleaned up).

[22] *Little*, 37 F.3d at 1075 (cleaned up).

[23] *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000) (citing 411 U.S. 792 (1973)).  "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption."  *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (cleaned up).

[24] *E.E.O.C. v. La. Office of Comm. Servs.*, 47 F.3d 1438, 1443 (5th Cir. 1995).

[25] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

employer "clearly set[s] forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."[26]

AP moves for summary judgment on each of Donnelly's and Johnson's claims. The Court will examine each claim in turn.

### A. Race and Sex Discrimination

A prima facie case of employment discrimination requires an employee to show that "(1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances."[27]  "[G]iven the similarity of a Title VII disparate treatment claim and a [S]ection 1981 claim, the evidence establishing a prima facie case under the former statute suffices to establish a prima facie case under the latter."[28]

### i.   Donnelly

Donnelly claims AP discriminated against him based on his race by (1) failing to promote him, (2) disciplining him more harshly than other employees, and

---

[26] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (cleaned up) (emphasis omitted).

[27] *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *see* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer [] to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]").

[28] *Scarlett v. Seaboard Coast Line R.R. Co.*, 676 F.2d 1043, 1053 (5th Cir. Unit B 1982) (cleaned up).

(3) terminating his employment.  The Court will address each claim in turn.

### a. Failure to Promote

Donnelly claims that AP discriminated against him based on race when it failed to promote him to the Team Lead position and again when it failed to promote him to the Senior Enrollment Specialist position.

Donnelly's first failure-to-promote claim—regarding the Team Lead position—is time-barred.  Donnelly alleges that AP did not promote him to the Team Lead position because unwarranted disciplinary action by AP rendered him ineligible for that promotion.  Section 1981 causes of action like failure-to-promote have a four-year statute of limitations.[29]  AP filled the Team Lead position on November 8, 2015, so Donnelly had until November 8, 2019 to file suit.  But he blew past that deadline, filing suit about six months later on May 1, 2020.  Accordingly, Donnelly is time-barred from bringing a Section 1981 claim for AP's failure to promote him to the Team Lead position.

Donnelly's second failure-to-promote claim—regarding the Senior Enrollment Specialist position—also fails.

First, the undisputed summary-judgment evidence shows that the person promoted to the position instead of Donnelly, Eddie Hicks, is also black.  "To establish a prima facie case for a failure to promote claim, a plaintiff must show that," among

---

[29] *Mitchell v. Crescent River Port Pilots Ass'n*, 265 F. App'x 363, 367–69 (5th Cir. 2008) (per curiam) (stating that causes of action under Section 1981 that arise under federal statutes enacted after December 1, 1990 are subject to a four-year statute of limitations); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348–49 (2013) (noting that 42 U.S.C. § 2000e-2(m), which defined a cause of action for employment discrimination (and thus, discriminatory failure to promote), arose under the Civil Rights Act of 1991).

other things, "the position []he sought was filled by someone *outside the protected class*."[30]  Donnelly claims he was treated less favorably than Hicks, who is also a member of Donnelly's protected class, so he cannot satisfy this element.  Of course, a prima facie discrimination case will require different elements in "differing factual situations."[31]  But it is appropriate here to require a showing from Donnelly that the person whom AP promoted in his stead was not also black because Donnelly claims that AP violated Section 1981 by refusing to promote him because he is black.[32]  Donnelly cannot make this showing, so his failure-to-promote claim cannot succeed.[33]

But even if this element were not required under these circumstances, Donnelly's failure-to-promote claim for this position still fails because he was ineligible for the job due to corrective measures AP had previously imposed for legitimate, non-discriminatory reasons.  AP's promotions policy states that employees

---

[30] *Burrell v. Crown Cent. Petroleum, Inc.*, 255 F. Supp. 2d 591, 616 (E.D. Tex. 2003) (emphasis added); *see also Lee*, 574 F.3d at 259 (stating that a prima facie case of racial discrimination in employment requires a showing that the plaintiff "was treated less favorably because of his membership in [a] protected class than were other similarly situated employees *who were not members of the protected class*" (emphasis added)).  Some Fifth Circuit cases do not include this specific sub-requirement when listing the elements of a prima facie failure-to-promote claim.  *See, e.g.*, *Haynes v. Pennzoil Co.*, 207 F.3d 296, 300 (5th Cir. 2000); *but see Burdine v. Tex. Dep't Cmty. Affairs*, 608 F.2d 563, 566–67 (5th Cir. 1979) (listing elements for failure-to-promote claim without mentioning the requirement that the person ultimately promoted not share the plaintiff's protected characteristic, but nevertheless concluding that a female plaintiff established a prima facie sex-discrimination case because, in part, the employer "hired a male for the position", *vacated on other grounds by Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 680–81 (5th Cir. 2001) (requiring that the person promoted instead of the plaintiff not share the protected characteristic in an age-discrimination case).

[31] *McDonnell Douglas*, 411 U.S. at 802 n.13.

[32] Doc. 1 at 15 (alleging "discrimination against [Donnelly] with respect to the terms and conditions of [his] employment because of [his] race and/or color").

[33] This defect also applies to Donnelly's failure-to-promote claim regarding the Team Lead position because both applicants ultimately selected for that position—Ashley Harris and Brittany Douglas—were black.  Doc. 79-2 at 232–33, 242.

are ineligible for any promotion if they're on a PIP, and Donnelly was on a PIP due to poor job performance at the time of his application.[34]  Though he testified that AP treated four of his co-workers more favorably and did not put them on a PIP for committing what he describes as the same infraction, at least two of those four co-workers are also black.[35]  AP's alleged preferential treatment toward four of his co-workers cannot alone support a race-discrimination claim when at least half of them share his protected characteristic.  And AP offers legitimate, non-discriminatory reasons for placing Donnelly on a PIP, such as unprofessional behavior, poor job performance, and data manipulation.

Donnelly offers no competent evidence to demonstrate that AP's reasons for declining to promote him, or for placing him on the PIP that precluded his promotion, were pretextual.  Critically, he offers no evidence linking his placement on the PIP to his race.[36]  He also offers no evidence to show that, for example, AP designed its

---

[34] Docs. 78-1 at 63; 78-3 at 294–95.

[35] Docs. 78-1 at 69 (listing Eddie Hicks, Byron Mitchell, Charmaine Martinez, and Reginald Taylor as co-workers allegedly not placed on a PIP despite similar performance issues to Donnelly's); 79-2 at 242 (stating that Eddie Hicks and Byron Mitchell are black and Charmaine Martinez is white). The Court was unable to confirm Reginald Taylor's race from the record, though AP claims in its briefing that he is black.  Doc. 80 at 54.

[36] Grasping for evidence of discrimination, Donnelly claims that a supervisor "went out of her [way] to ensure that [he] 'should not be eligible for anything.'"  Doc. 91 at 40 (cleaned up).  But the email Donnelly quotes does not state, or even suggest, the supervisor's wish to exclude Donnelly from promotional opportunities; rather, it depicts a conversation between the supervisor and HR looking for documentation to confirm Donnelly's status as ineligible for a promotion.  Doc. 92-15 at 2.  In response to an HR representative's request for such documentation, the supervisor sent the HR representative a description of Donnelly's disciplinary status to confirm that "he should not be eligible for anything," and the HR representative explained that Donnelly's file was incomplete and that AP "need[ed] to find documentation" to "confirm Donnelly's ineligibility."  *Id.*  Donnelly also claims that he "seemed to receive a lot of verbal warnings around the time that the senior [] key lead positions would be offered."  Doc. 78-1 at 57.  Donnelly offers no further citation to support his opinion about how things "seemed" to him, and the Court cannot credit unsupported speculation or subjective belief as competent summary-judgment evidence.

promotion policy to favor or harm employees based on their races, or that AP's Quality Assurance standards or rules regarding data manipulation and workplace behavior took race into account.  The Court thus finds that AP provided evidence of legitimate, nondiscriminatory reasons for declining to promote Donnelly and Donnelly has offered no evidence showing those reasons were merely pretext for race discrimination.

Accordingly, the Court **GRANTS** summary judgment for AP on Donnelly's race-discrimination claims based on AP's failure to promote him to the Team Leader and Senior Enrollment Specialist positions.

### b.  Disparate Treatment

Donnelly claims that AP discriminated against him based on his race by disciplining him disproportionately compared to other employees.  Specifically, Donnelly says he "receiv[ed] write ups and coaching," "was placed on corrective action for a failed call review," and "was placed on a 90-day final notice due to the call reviews."[37]  Citing these acts, Donnelly claims that AP discriminated against him by engaging in disparate treatment relative to AP's other, non-black employees.

"In order to establish a prima facie case of disparate treatment discrimination, [a] plaintiff must prove," among other things, that "he suffered an adverse employment action."[38]  The term "adverse employment action" "usually applies only to ultimate employment decisions such as hiring, granting leave, discharging,

---

[37] Doc. 1 at 6.

[38] *Cannon v. St. Paul Fire & Marine Ins. Co.*, No. 3:03-CV-2911-N, 2005 WL 1107372, at *3 (N.D. Tex. May 6, 2005) (Godbey, J.).

promoting, or compensating," and "[a]s a rule of thumb, if the decision does not affect job duties, compensation, or benefits, then it is not an adverse employment action."[39] "As a matter of law," being "chastised by superiors . . . do[es] not rise to the level of material adversity."[40]  "[A]llegations of unwarranted complaints about the quality of the plaintiff's work and unnecessary job scrutiny and criticisms are not considered adverse employment actions."[41]

Donnelly's disparate-treatment claim fails as a matter of law because he did not establish that he suffered an adverse employment action.  The write-ups, coaching, corrective action, and final notice he received from AP are not ultimate employment decisions as defined by the Fifth Circuit.  Instead, they amount to complaints, criticisms, and job scrutiny from AP, none of which rises to the level of an adverse employment action.

Donnelly's complaint appears to further allege that AP's disparate treatment was an "adverse employment action" because it resulted in his ineligibility for a promotion.[42]  Title VII was designed only to address "ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."[43]  But even assuming that AP's

---

[39] *Rahman v. Exxon Mobil Corp.*, 56 F.4th 1041, 1045 (5th Cir. 2023) (cleaned up).

[40] *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331–32 (5th Cir. 2009).

[41] *Puleo v. Texana MHMR Ctr.*, 187 F. Supp. 3d 769, 782 (S.D. Tex. 2016).

[42] This argument could only refer to the Senior Enrollment Specialist position because Donnelly applied for, and was rejected for, the Team Lead position before the alleged disparate treatment occurred.  Doc. 1 at 6.

[43] *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir. 1995), *overruled on other grounds as recognized by Drake v. Nicholson*, 324 F. App'x 328, 331–32 (5th Cir. 2009).  *Drake* acknowledged the Supreme Court's lessened standard for retaliation claims, confirming that—in the retaliation context—"an adverse employment action is any action that might have dissuaded a reasonable worker from making

disciplinary actions could support Donnelly's prima facie disparate-treatment claim because they prevented his promotion, AP has presented a host of legitimate, non-discriminatory reasons for deciding to discipline Donnelly and not promote him based on that discipline.  AP's evidence, which Donnelly does not dispute, shows that Donnelly repeatedly refused to follow the Discussion Guide after AP told him that doing so was mandatory, missed his application goals for several months, received multiple warnings for repeated tardiness and unprofessional conduct, generated co-worker complaints for being aggressive, auto-failed his calls at more than double the rate of his peers, and continually engaged in illicit data manipulation.  Donnelly's conduct justified AP's disciplinary acts against him.  Donnelly has no evidence that these legitimate, non-discriminatory reasons were pretext for race discrimination, even if they ultimately precluded his promotion.[44]

In short, the instances of disparate treatment Donnelly alleges were not "adverse employment actions" as defined by the Fifth Circuit, so Donnelly cannot satisfy that element of his disparate-treatment claim as a matter of law.  And even if he could, AP has presented multiple legitimate, non-discriminatory reasons for disciplining Donnelly that he has not shown to be pretextual.  Thus, there is no genuine dispute of material fact, and the Court **GRANTS** summary judgment for AP

---

or supporting a charge of discrimination."  *Drake*, 324 F. App'x at 332.  Even under this standard, Donnelly's disparate-treatment claim would still fail.

[44] The Court also notes that this failure-to-promote claim disguised as a disparate-treatment claim is likely doomed by the fact that AP ultimately promoted a member of Donnelly's protected class to the Senior Enrollment Specialist position.  *See Cannon*, 2005 WL 1107372, at *3 (stating that "a prima facie case of disparate[-]treatment discrimination" requires proof that the employee "was replaced by someone not of the protected class or [that] others similarly situated were more favorably treated" (cleaned up)).

on Donnelly's disparate-treatment claim.

### c.  Termination

AP asserts that Donnelly's claim of race-based discrimination arising from his termination fails because AP replaced Donnelly with a black employee, but AP fails to cite evidence in the record to support this claim.[45]  AP further challenges Donnelly's prima facie termination case "because he has no evidence of disparate treatment" and no "proper comparators."[46]  Donnelly disputes these claims.  But even assuming that the evidence establishes a prima facie case that Donnelly's termination was due to race-based discrimination, AP has provided legitimate, nondiscriminatory reasons for terminating him, and Donnelly has provided no evidence to show that those reasons were pretextual.[47]  The evidence shows that AP terminated Donnelly for legitimate, nondiscriminatory reasons, including data manipulation, poor work performance, and repeated failure to follow direct instructions from his supervisors.

Donnelly responds only to the first accusation—data manipulation—and does so by mischaracterizing the evidence rather than denying it.  Donnelly's direct supervisor, Salman Meherali, stated that Donnelly manipulated data by "going into

---

[45] Docs. 80 at 26, 55; 98 at 23 (asserting that AP replaced Donnelly with a new employee named Michelle Richards, who is also black, but citing only to Doc. 79-2 at 232–43, which contains no mention of Donnelly's replacement).  The Court found no evidence showing the race of Donnelly's replacement and need not scour the record to find support for AP's claims.  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").

[46] Doc. 80 at 54–55.

[47] To the extent Donnelly's general assertions that he felt targeted and singled out permit an inference of pretext, it is "possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination."  *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 903 (5th Cir. 2000).  And given the volume and credibility of AP's unrefuted reasons for terminating Donnelly, any possible inference of pretext would be tenuous indeed.

[his co-workers'] databases and stealing leads," which he was "not supposed to do" and which he had been warned about "in writing."[48]  In response, Donnelly quotes Meherali's deposition selectively, claiming he was merely "going in prior to his shift and putting notes on files to search for applicants that nobody else had talked to."[49] But Meherali's full sentence clarifies that Donnelly looked for students "that nobody else had talked to *so that way he c[ould] get [the leads] in his name*."[50]  Donnelly's selective citations serve only to emphasize that no evidence stands against AP's first stated reason for firing him.  Unlike any other AP employee the Court has evidence of, Donnelly manipulated data in an attempt to take leads from his co-workers for himself, despite warnings and written instructions to stop.  And Donnelly offers no evidence to rebut AP's other stated reasons for terminating him, including unprofessional conduct, complaints from co-workers about his aggressive behavior and derogatory comments, and his repeated failure to comply with clear workplace instructions.

Because AP established legitimate, nondiscriminatory reasons for terminating Donnelly, the burden shifts to Donnelly to show that AP's reasons were mere pretext for race-based discrimination.  Donnelly cannot make such a showing.  Instead, he points to his HR report that stated that AP's disciplinary actions toward him were

---

[48] Doc. 79-2 at 158.

[49] Doc. 91 at 41 (citing Doc. 92-17 at 6–7).  Donnelly's summary-judgment appendix includes only selected excerpts from Meherali's deposition and thereby omits important context, such as Meherali's statement that Donnelly "was doing it to basically [] make his life a lot easier to hit his goals," that no other "enrollment specialists [] ever did the same thing," and that the leads Donnelly accessed had already been "assigned round robin to other team members" who "get[] to keep those for themselves."  Doc. 79-2 at 158–60.

[50] Doc. 79-2 at 158–59 (emphasis added).

discriminatory, and he asserts that his termination on the same day as that report provides "sufficient proof of [AP's] pretext."[51]  But it doesn't.  Again, Donnelly disguises one claim as another to bolster a legally deficient argument.  This time, he alleges a retaliation claim where his discriminatory-termination claim cannot succeed: AP terminated him after he complained of discrimination, his argument goes, and therefore AP's stated reasons for terminating him cannot be true because *retaliation* was AP's true motive.  This reasoning utterly fails to engage with, let alone refute, AP's stated rationale for terminating Donnelly.  Far from "demonstrat[ing] that [AP's] explanation is not credible and merely a pretext for race-based discrimination," Donnelly instead tries to sidestep AP's reasoning, obfuscate the nature of his claim, and rely on inapposite law and unproven inferences.[52]

AP presented evidence showing that it terminated Donnelly due to data manipulation, poor work performance, and unprofessional conduct, and Donnelly presented no evidence to challenge the credibility of that claim or expose it as mere pretext for racial discrimination.  He does not even deny the behavior that AP says prompted his termination.  Instead, Donnelly alleges that AP terminated him due to retaliation, but that is a separate claim that the Court addresses below.  Because Donnelly failed to introduce evidence that could convince a reasonable jury that AP's stated reasons for firing him were pretext for race-based discrimination, the Court

---

[51] Doc. 91 at 41.

[52] *Goyal v. Goodman Networks Inc.*, No. 3:13-CV-4751-B, 2015 WL 2236665, at *4 (N.D. Tex. May 13, 2015) (Boyle, J.).

finds no genuine dispute of material fact and **GRANTS** summary judgment for AP on Donnelly's termination claim.

### ii.   Johnson

Johnson alleges that AP discriminated against her on the basis of her sex and her race.  The Court will address each claim in turn.

### a. Sex Discrimination

Johnson first claims that AP failed to allow her to negotiate her pay after her 2017 promotion to Enrollment Manager but allowed two of her male counterparts to negotiate their pay when they were promoted to the same role the next year.  This portion of Johnson's sex-discrimination claim is time-barred.  To timely exhaust her administrative remedies and thus maintain her discrimination claim, Johnson was required to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") "within three hundred days after the alleged unlawful employment practice occurred."[53]

Johnson filed her charge with the EEOC on March 28, 2019.  So any claims that occurred before June 1, 2018—300 days prior—are time-barred.  AP argues that the limitations period began on the date Johnson *learned of* the conduct, but the Supreme Court has made clear that "[a] discrete . . . discriminatory act 'occurred' on

---

[53] 42 U.S.C. § 2000e-5(e)(1).  Texas state law also required Johnson to file with the Texas Workforce Commission ("TWC"), and Johnson could not recall whether she had done so.  Doc. 78-3 at 165.  But Title VII's "300-day filing period . . . applies regardless [of] whether state proceedings are timely filed under state or local law," and a worksharing agreement between the EEOC and the TWC designated the EEOC as the TWC's agent for purposes of filing charges.  *Griffin v. City of Dall.*, 26 F.3d 610, 612 (5th Cir. 1994).

the day that it 'happened.'"[54]  Johnson was had to file her charge "within . . . 300 days of the date of the act or lose the ability to recover for it."[55]

Regardless of when Johnson alleges AP's discriminatory "act"—*i.e.*, not allowing her to negotiate salary while allowing the two men to do so—occurred, all of the possible dates fall well before June 1, 2018.  She signed her offer letter, accepting the promotion to Enrollment Manager in Education, on February 10, 2017, and her promotion became effective on February 27, 2017.  On January 29, 2018, AP promoted two men to the position of Enrollment Manager.  Johnson's EEOC charge states that she learned "[i]n February of 2018" that these men "were able to negotiate their pay," but that she "was not able to negotiate salary" when she received her raise.[56]  And Johnson testified that she lodged her final complaint with AP on March 16, 2018.[57]

Johnson failed to timely file her EEOC charge, so her sex-discrimination claim concerning salary negotiation is time-barred as to this act of alleged sex discrimination.[58]

Johnson also claims that AP discriminated against her based on her sex

---

[54] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).

[55] *Id.*

[56] Doc. 79-1 at 97.

[57] Doc. 78-3 at 144–45.

[58] Johnson's only response to AP's limitations argument is that one of the emails Johnson sent to a superior regarding the alleged pay disparity "was merely one fact of many which continued well into the limitations period."  Doc. 91 at 33 n.155.  This assertion blurs the line between Johnson's claim that AP committed a discrete act of sex discrimination and her claim that AP promoted a hostile work environment through a pattern or practice of sex discrimination.  Since Johnson here complains of a discrete act—failing to let her negotiate her salary while letting men do so—the limitations period began accruing when that act occurred.  "[D]iscrete discriminatory acts are not actionable if time[-]barred, even when they are related to acts alleged in timely filed charges."  *Morgan*, 536 U.S. at 113.

21

because she "was treated differently than her male colleagues, including but not limited to [AP's] allowing her co-workers to repeatedly berate[] and harass[] her."[59] In support of this claim, Johnson points to a few allegations from her deposition testimony, but none is adequate to support a sex-discrimination claim as a matter of law because none constitutes an adverse employment action. Her claims that her team "ha[d] been allowed to be disrespectful" and that "[i]t was a team with a lot of men" do not allege any actionable instance of discriminatory treatment against her based on her sex.[60] And Johnson does not claim that this alleged treatment impacted her ability to perform her job. Similarly, her claim that AP's managers told her she was "being too disrespectful" and "need[ed] to bring it back" when she raised her voice in response to disrespect from her male team members cannot support a claim of sex discrimination.[61] Neither claim constitutes an "adverse employment action," and neither claim is accompanied by any evidence that AP treated similarly situated male employees any differently (*e.g.*, that AP permitted men to raise their voices at

---

[59] Doc. 91 at 33. This argument begins to resemble Johnson's hostile-work-environment claim, but the Supreme Court "has distinguished claims alleging discrete discriminatory acts from those alleging a hostile work environment," and that distinction requires the Court to consider these claims for the discrete acts they allege rather than for an environment those acts might have caused. *Brooks v. Firestone Polymers, LLC*, 70 F. Supp. 3d 816, 837 (E.D. Tex. 2014). And this is not a "pattern and practice" discrimination claim because Johnson failed to exhaust her administrative remedies as to that claim by failing to raise it in her EEOC charge. *Richardson v. Porter Hedges, LLC*, 22 F. Supp. 3d 661, 666–67 (S.D. Tex. 2014) (finding that an employee "did not exhaust her pattern and practice discrimination claim" because "the factual allegations in [her EEOC charge] concern[ed] only her *individual* experience of allegedly being discriminated based on . . . sex"); Doc. 79-1 at 97–98 (alleging, in Johnson's EEOC charge, that AP "has a pattern and practice of not allowing Females to negotiate their salary"—a discrimination claim which was time-barred as to Johnson—but failing to allege a pattern or practice of sex discrimination in terms of workplace treatment).

[60] Doc. 78-3 at 149.

[61] *Id.*

subordinates without reprimanding them).[62]

Because her claims are either time-barred or legally insufficient, Johnson's sex-discrimination claims cannot succeed as a matter of law.[63]  The Court **GRANTS** summary judgment for AP on this claim.

### b.  Failure to Promote

Regarding race discrimination, Johnson alleges that AP discriminated against her by (1) failing to promote her, (2) issuing the Final Written Warning, and (3) terminating her employment.

As to her first race-discrimination claim, Johnson alleges that AP discriminated against her on the basis of her race by failing to post the Senior Manager position and by failing to promote her to the Partner Support position.  She also alleges that AP engaged in a pattern and practice of race discrimination in its hiring and promotional practices.

Turning to the Senior Manager position, Johnson cannot establish at least two of the prima facie elements for a race-discrimination claim, namely, that she "applied and was qualified for a job for which the employer was seeking applicants" and that "after [her] rejection, the position remained open and the employer continued to seek

---

[62] *See Rahman*, 56 F.4th at 1045 ("As a rule of thumb, if the decision does not affect job duties, compensation, or benefits, then it is not an adverse employment action." (cleaned up)); *Lee*, 574 F.3d at 259 (requiring, as a prima facie element of an employment-discrimination case, that the employee "was treated less favorably because of his membership in [a] protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances").

[63] As a final instance of alleged sex discrimination, Johnson says her manager testified that he "does not think that it is possible for a [b]lack women [*sic*] to get more disrespect in positions of leadership compar[ed] to white men."  Doc. 91 at 23.  This grossly misstates the testimony, in which the manager answered only "I don't know" when repeatedly asked to generalize and compare the workplace experiences of black women and white men.  Doc. 79-2 at 117–18.

applicants from persons of [her] qualifications."[64]   While "the prima facie proof required" may vary in response "to differing factual situations," even interpreting these requirements loosely and most favorably to Johnson, she cannot satisfy them.[65]

As to the first defect, the evidence shows that Johnson did not apply for, and was not qualified for, the Senior Manager position.   AP made clear that it would fill some of the new Senior Manager positions using placements (rather than with applications and interviews) by employees who met the requirements and that it would post future Senior Manager positions for applications and interviews.   AP created and filled three Senior Manager positions without taking applications, so Johnson could not have applied and does not claim that she did.   Thus, Johnson cannot establish a prima facie failure-to-promote case because she cannot show that she "applied . . . for a job for which [her] employer was seeking applicants."[66]

Even if Johnson could establish a prima facie case as to the Senior Manager position, AP has presented a legitimate, nondiscriminatory, and unrebutted reason for not selecting her for this position: She did not meet the job requirements.   AP published the requirements for the Senior Manager role, which included a "Good Performance rating or better[] on 5 of 6 Leadership Competencies in prior role (prior year)."[67]   The undisputed summary-judgment evidence shows that Johnson failed to attain such a ranking.   Johnson does not attempt to argue that the Senior Manager

---

[64] *McDonnell Douglas*, 411 U.S. at 802.

[65] *Id.* at 802 n.13.

[66] *Id.* at 802.

[67] Doc. 79-2 at 8.

job requirements and her failure to meet them were mere pretext for race discrimination. Thus, her failure-to-promote claim as to the Senior Manager position fails as a matter of law.

Johnson's claim regarding the Partner Support position also cannot succeed. Under AP's undisputed policy, employees on active corrective action are ineligible for promotion.[68] And Johnson testified that she did not receive the promotion because she was on active corrective action.[69] She was thus not "qualified for [the] job" and cannot establish that element of a prima facie case.[70] And AP hired a black employee to ultimately fill the position, which further thwarts Johnson's prima facie case.[71] For these reasons, Johnson's failure-to-promote claim as to the Partner Support position fails.

Finally, Johnson alleges that AP engaged in a pattern or practice of racial discrimination in its hiring and promotional practices vis-à-vis Johnson and Donnelly in particular, but clear precedent shows that she cannot bring this type of claim.[72] Faced with a party that was "attempt[ing] to convince [it] that their suit [was] a 'pattern and practice claim,'" the Fifth Circuit held that "[t]hat label is inaccurate as

---

[68] Doc. 78-3 at 82–83.

[69] *Id.* at 170. Johnson alleges that AP placed her on active corrective action in retaliation for her protected activity. The Court analyzes Johnson's retaliation claim below.

[70] *McDonnell Douglas*, 411 U.S. at 802.

[71] Doc. 79-2 at 240, 242; *Lee*, 574 F.3d at 259 (stating that a prima facie case of racial discrimination in employment requires a showing that the plaintiff "was treated less favorably because of his membership in [a] protected class than were other similarly situated employees *who were not members of the protected class*" (emphasis added)).

[72] Doc. 79-1 at 98 (alleging, in Johnson's EEOC charge, that "[i]t is a pattern and practice that [b]lacks are normally interviewed up to five (5) times[] before selection[; h]owever, [w]hite employees are selected without an interview"); Doc. 91 at 46 (alleging a "pattern and practice of refusing to promote" Donnelly and Johnson).

applied" to a case that was "n[either] a 'pattern and practice' suit by the government . . . . [n]or . . . a private class action."[73]  In rejecting the "pattern and practice" label for an individual plaintiff's discrimination claim, the Fifth Circuit noted that "[a]n individual proceeding as an individual under Title VII must prove the elements of a discriminatory hiring claim as set forth in *McDonnell Douglas*," which the party "failed to do."[74]  The Supreme Court has stated that "[t]he plaintiff in a pattern-or-practice action is the Government," and it has also upheld a finding of "a discriminatory hiring pattern and practice" in the context of a class action.[75]  Johnson brings her Title VII claim neither as the government nor on behalf of a class, but instead on behalf of herself, as an individual.  Her claim must rise or fall under the *McDonnell Douglas* standard for individual Title VII claims, not the alternative "pattern or practice" standard.[76]

The evidence does not show a genuine dispute of material fact as to any of Johnson's failure-to-promote claims.  Since none may succeed as a matter of law, the Court **GRANTS** summary judgment for AP on this claim.

---

[73] *Scarlett*, 676 F.2d at 1053.

[74] *Id.*

[75] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 359–62 (1997) (cleaned up); *see also Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 772 (1976); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355 (5th Cir. 2001) ("The typical pattern or practice discrimination case is brought either by the government or as a class action," and "[t]he pattern and practice method of proof is almost exclusively used in class actions, with individual racial discrimination plaintiffs confined to the *McDonnell Douglas* framework."), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

[76] *See Celestine*, 266 F.3d at 355 ("The Supreme Court has never applied the [pattern-or-practice] method of proof in a private, non-class suit and has recognized the distinction between individual racial discrimination claims and class actions[.]" (citing *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984))).

### c.  Disparate Treatment

Johnson alleges that AP treated her worse than other non-black employees by issuing her a Final Written Warning.  As a warning, this act was not an "adverse employment action" because it was not an "ultimate employment decision[] such as hiring, granting leave, discharging, promoting, or compensating."[77]  It "d[id] not affect job duties, compensation, or benefits, [so] it [was] not an adverse employment action."[78]

Johnson claims that the Final Written Warning amounts to an ultimate employment decision because it "was the only reason she was not promoted" to the Partner Support position.[79]  That argument fails for two reasons.  First, as with Donnelly's claim discussed above, this is a failure-to-promote claim disguised as a disparate-treatment claim.  And since AP presented a legitimate, nondiscriminatory reason for not promoting Johnson to the Partner Support position and she failed to show it was mere pretext for race discrimination, her failure-to-promote claim cannot succeed in this context where it could not succeed on its own.

And second, even if Johnson could establish a prima facie disparate-treatment case based on the Final Written Warning, unrebutted evidence establishes AP's legitimate, nondiscriminatory reason for issuing that warning.  AP presented evidence that Johnson revealed confidential information about another employee's impending termination.  In her deposition, Johnson denied revealing this confidential

---

[77] *Rahman*, 56 F.4th at 1045 (cleaned up).

[78] *Id.*

[79] Doc. 91 at 37 (emphasis omitted).

information.[80]  But that doesn't create a genuine dispute of material fact because, in cases where an adverse employment action is "based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith."[81]  The evidence shows that AP's belief that Johnson shared confidential information was reasonable because it was based on a joint investigation by Johnson's supervisor and an HR representative, which included interviews with Johnson, the employee who reported Johnson's alleged illicit disclosure, and the employee with whom Johnson allegedly spoke.[82]  Johnson offers no reason why AP's ultimate belief in the employee's report against her was unreasonable.  AP thus established a legitimate, nondiscriminatory reason for issuing the Final Written Warning, and the burden shifts to Johnson to prove that reason was mere pretext for race discrimination.

Johnson argues that AP's reason for issuing her Final Written Warning was pretextual because no other employee had ever received one without "going through the normal, progressive discipline steps" and because her supervisor who issued the warning had previously made a racially disparaging comment.[83]  Her first argument misstates the testimony of AP's Vice President of HR, who testified that she did not remember any employee being "terminated" without going through AP's progressive

---

[80] Doc. 78-3 at 160.

[81] *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (cleaned up).

[82] Doc. 79-2 at 229.

[83] Doc. 91 at 38–39.

disciplinary steps, not that none had ever been issued a Final Written Warning without going through those steps.[84]  And as to the isolated comment from Johnson's supervisor—who Johnson testified asked her, "[W]hat a [*sic*] black girl going to do with all that money when you get that [promotion]?"[85]—this amounts to a "stray remark[]" from an employee who was not the decision maker that, "standing alone, [is] insufficient to defeat summary judgment."[86]

The Final Written Warning was not an "adverse employment action" as defined by the Fifth Circuit.  Even if it were, AP has provided legitimate, nondiscriminatory reasons for issuing it, and Johnson has no legally sufficient evidence that those reasons are pretextual.  Thus, the Court **GRANTS** summary judgment for AP on Johnson's disparate-treatment claim.

### d. Termination

AP argues that Johnson cannot make out a prima facie case of race-based employment discrimination arising from her termination due to uncontested evidence showing that AP replaced her with another black employee.  But in the termination context, the Fifth Circuit has stated that "the single fact that a plaintiff is replaced by someone" of the same race "does not negate the possibility" of discriminatory

---

[84] Doc. 79-2 at 185.

[85] Doc. 78-3 at 156.

[86] *Jackson*, 602 F.3d at 380 & n.27 (explaining the Fifth Circuit's "stray remarks doctrine"). "[C]omments are evidence of discrimination" rather than stray remarks if they, among other things, are "made by an individual with authority over the employment decision at issue."  *Id.* at 380.  While the individual who allegedly made the remark, Salah Eid, was involved in the investigation into Johnson's disclosure of confidential information, it was Earl Frischkorn, AP's Senior Vice President of Enrollment & Retention Services, who held authority over the employment decision, not Eid.  Doc. 79-2 at 229 ("Given the seriousness of the infraction, I [(Frischkorn)] could have terminated Johnson's employment, but decided to issue Johnson[] a Final Written Warning instead.").

motive by the employer.[87]  Instead, this factor, "[w]hile not outcome[-]determinative," is "certainly material to the question of discriminatory intent."[88]  This framework allows courts to consider the race of the plaintiff's replacement as one factor, while requiring them to also look further for evidence of discrimination beyond the plaintiff's "subjective belief."[89]  So while Johnson was replaced by another black employee, this fact alone does not preclude her prima facie case.

But even assuming Johnson has made out a prima facie case, AP has provided a legitimate, nondiscriminatory reason for her termination.  Frischkorn made the ultimate decision to terminate Johnson.  His stated reason was "unprofessional conduct."[90]  This decision was supported by four upper-level AP employees who all reported that, after she was issued her Final Written Warning, Johnson acted extremely unprofessionally and so aggressively that some witnesses reported feeling physically threatened.[91]  Though Johnson disputes this, Frischkorn acted reasonably in relying on four employee accounts of Johnson's unprofessionalism, which were denied only by Johnson herself.[92]  Frischkorn's decision is also bolstered by his

---

[87] *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 246–47 (5th Cir. 1985).

[88] *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997).

[89] *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 426–27 (5th Cir. 2000) (agreeing with an employer that a white employee, after being terminated and replaced with another white employee, could not bring a prima facie race-discrimination case, but noting that this was not because the replacement shared the plaintiff's race, but rather because the plaintiff failed to produce any direct or indirect evidence of discrimination and instead asked the court "to rely on his subjective belief" that he was a victim of discrimination).

[90] *Id.*

[91] *Id.* at 229–30, 240.

[92] *See Jackson*, 602 F.3d at 379 ("Jackson's self-serving statements that he did not commit sexual harassment are insufficient to create a triable issue of fact as to whether Cal-Western fired him because of his age.").

unrebutted testimony that he could have terminated Johnson for her alleged leak of confidential information but decided to issue the Final Written Warning instead of immediately jumping to termination.

Johnson's unprofessional conduct provided AP a legitimate, nondiscriminatory reason for terminating her, and she cannot carry her burden to show that AP's reason is mere pretext for race-based discrimination. She argues that the proximity between her termination and her alleged complaint of discrimination suggests pretext, but such "[t]emporal proximity, standing alone, is not enough" to show pretext, and retaliation is a separate claim the Court addresses below.[93] Johnson further argues pretext based on her supervisor's isolated racial comment, which, as discussed, amounts to a "stray remark" that cannot show pretext because he is not the AP official who took adverse employment action against her.[94] And she argues that her denial

---

[93] *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012).

[94] *See* Doc. 78-3 at 156; *Jackson*, 602 F.3d at 380. Johnson's argument may be interpreted as alleging a cat's-paw theory. "A cat's paw is a dupe who is used by another to accomplish his purposes." *Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (cleaned up). To establish cat's-paw liability in the employment-discrimination context, "a plaintiff must show that the person with [discriminatory] animus used the decisionmaker to bring about the intended [discriminatory] action." *Zamora v. City of Hous.*, 798 F.3d 326, 331 (5th Cir. 2015). To the extent Johnson alleges that Frischkorn was a mere cat's paw used by her supervisor, Salah Eid, to enact his discriminatory animus, this theory fails as a matter of law for at least two reasons.

First, the Supreme Court has held that in a cat's-paw case, a discriminatory agent—here, Eid—is "responsib[le] for the adverse action"—here, Johnson's termination—"if the adverse action is the *intended consequence* of that agent's discriminatory conduct." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (emphasis added); *Zamora*, 798 F.3d at 331 (requiring that the discriminatory actor used the cat's paw to "bring about the intended [] action"). There is zero evidence that Johnson's termination was the "intended consequence" of Eid's alleged discriminatory conduct, *i.e.*, his alleged stray remark: "[W]hat a [sic] black girl going to do with all that money when you get that [promotion]?" Doc. 78-3 at 156. Johnson pointed to this remark to support her failure-to-promote claim, which it cannot do. This remark alone also cannot support a claim that Eid's intended consequence was causing Johnson's termination. Johnson offers no evidence that Eid wanted her fired. She viewed the remark as evidence he didn't want her to be promoted. The crucial "intended consequence" element is missing.

Moreover, Johnson has no evidence that Eid "used" Frischkorn to enact his alleged animus. No evidence whatsoever indicates that Frischkorn was Eid's "dupe." On the other hand, ample

of the allegations against her creates a dispute of fact regarding pretext, but the Court's focus is "not the truth or falsity of the allegation, but whether [AP] reasonably believed the employee[s'] allegation and acted on it in good faith."[95]   Johnson has provided no reason to disbelieve the *reasonableness* of AP's reliance on the multiple witnesses who claimed Johnson revealed confidential information and behaved unprofessionally upon receiving the Final Written Warning, so this argument fails.[96]

Finally, Johnson argues pretext by pointing to the Vice President of HR's testimony that she did not remember any employee being terminated without going through AP's progressive disciplinary steps.  This argument fails.  Johnson provides no evidence showing whether, or for what infraction, any other AP employees went through AP's disciplinary steps, so she cannot prove that her unprofessional conduct was insufficient to warrant skipping the steps altogether.  Indeed, the Vice President of HR made clear that a termination like Johnson's, that may not have gone through

---

[95] evidence shows that Frischkorn acted independently in terminating Johnson.  He noted an independently sufficient alternative reason for terminating her that completely circumvented Eid's influence: her alleged leak of confidential information, which he learned of and confirmed with other sources. Doc. 79-1 at 229. And at least three employees besides Eid informed Frischkorn's decision to issue the Final Written Warning, and two additional employees besides Eid confirmed facts that led Frischkorn to terminate her. *Id.* at 229–30. Frischkorn even stated that he "t[ook] the weekend to think about the appropriate corrective action to take given the various witness accounts of Johnson's unprofessional conduct." *Id.* at 230. This indicates independent, autonomous action by Frischkorn. Since Johnson provides absolutely no evidence to indicate that Eid "used" Frischkorn as his "dupe" to get Johnson terminated, a cat's-paw theory could not succeed.

[95] *Jackson*, 602 F.3d at 379.

[96] Johnson appears to suggest that alleged discriminatory stray remarks should have tipped AP off that the employees reporting her confidentiality breach were motivated by racial discrimination, but no evidence indicates that Frischkorn was aware of these alleged comments at the time he credited the testimony against Johnson.  And "[e]ven if evidence suggests that [an employer's] decision was wrong," a court may not "substitute [its] judgment" for "the employer's business judgment."  *Scott v. Univ. of Miss.*, 148 F.3d 493, 509–10 (5th Cir. 1998), *abrogated on other grounds by Kimel v. Fla. Bd. Of Regents*, 528 U.S. 62 (2000).  And as the Court notes above, Johnson has failed to offer any evidence that Frischkorn acted as a mere cat's paw to enact the discriminatory animus of another employee.

all the steps, would be "based on the egregiousness [] of the circumstance."[97]  With no evidence to show that her termination was unjustified under AP's policy, and with no evidence linking racial animus to AP's decision to skip some of the disciplinary steps, no reasonable jury could find that AP's legitimate, nondiscriminatory reason for terminating Johnson was actually pretext for race discrimination.[98]

Accordingly, the Court **GRANTS** summary judgment for AP on Johnson's race discrimination claim based on her termination.

## B. Retaliation

A prima facie retaliation case requires a plaintiff to show that "(1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."[99]  "Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII."[100]  "A

---

[97] Doc. 79-2 at 185.  The Vice President of HR went on to list the following other "egregious[] . . . circumstance[s]" that would warrant immediate termination: "[t]heft, breach of confidentiality by . . . someone in a leadership position, [and] lying to . . . one of our business partners."  *Id.*  Johnson presents no evidence that any non-black employee committed these infractions and was *not* summarily terminated.

[98] Even if Johnson could show that AP singled her out to skip the disciplinary steps and was unreasonable in doing so, "proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that [Johnson's] proffered reason is correct."  *Reeves*, 530 U.S. at 146–47 (cleaned up).  "It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* [Johnson's] explanation of intentional discrimination."  *St. Mary's*, 509 U.S. at 519.  Aside from a single stray remark, Johnson offers no evidence linking her termination to her race.

[99] *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  The elements are identical for a prima facie case of retaliation under either Title VII or Section 1981.  *Foley v. Univ. of Hous. Sys*, 324 F.3d 310, 316 n.7 (5th Cir. 2003).

[100] *Ackel v. Nat'l Comms., Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (cleaned up).

vague complaint that does not reference a discriminatory employment practice does not constitute a protected activity."[101]

### i. Donnelly

Assuming he could establish that he engaged in protected activity, Donnelly's prima facie retaliation claim fails because he cannot establish the third element, namely, a causal link between his alleged protected activity and his termination. First, he does not dispute that the decision to terminate him was made prior to his conversation with Employee Relations Generalist Tena Bracy, which is when Donnelly says he engaged in protected activity.[102]  Although AP did not immediately act on the decision to terminate Donnelly due to the necessary HR personnel being out of the office sick, Donnelly offers no evidence to show that his conversation with Bracy informed the decision at all, much less that his specific comment from that conversation was known to the decision maker.[103]  Without this causal link, Donnelly

---

[101] *Carter v. Target Corp.*, 541 F. App'x 413, 418 (5th Cir. 2013) (per curiam).

[102] Doc. 79-2 at 226–27 (declaration of Frischkorn, who made the decision to terminate Donnelly, stating that he attended a meeting "on November 1, 2018, to discuss Donnelly's ongoing performance and behavioral issues," and that "[a]t that time, I decided to terminate Donnelly's employment with AP" despite the fact that "Bracy was scheduled to meet with Donnelly, at his request, later that day to discuss unknown issues").  The protected activity Donnelly alleges from his conversation with Bracy was telling her that he "felt like there was a disparity with the difference between the way—as far as promotions, the way blacks and whites were treated at the job." Doc. 78-1 at 84.  The Court notes that Donnelly's qualifier—that he "felt like" a disparity existed—likely disqualifies this statement as adequate summary-judgment evidence.  *See Islamic Ass'n of DeSoto, Tex., Inc. v. Mortg. Elec. Registration Sys., Inc.*, No. 3:12-CV-0613-D, 2013 WL 169229, at *7 n.11 (N.D. Tex. Jan. 16, 2013) (Fitzwater, C.J.) ("Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary[-]judgment evidence.").

[103] Frischkorn, the decision maker, notes that AP's Director of HR furnished him with a copy of Bracy's summary of her conversation with Donnelly.  That summary, included in the summary-judgment record, makes no mention of Donnelly's alleged comment, race discrimination, or any other protected activity.  Doc. 78-3 at 57–58.  There is no evidence Frischkorn spoke with Bracy after her conversation with Donnelly, and Frischkorn's declaration does not say that her report influenced his decision—which he made over a week before viewing her report—in any way.  Instead, Frischkorn

cannot make out a prima facie retaliation case.

Even if he could establish a causal link between his complaint and his termination, Donnelly's retaliation claim fails as a matter of law because AP presented a legitimate, nondiscriminatory reason for terminating Donnelly— "ongoing data manipulation and other behavioral issues"[104]—and Donnelly presented no evidence that this reason was pretextual.  Donnelly claims only that the temporal proximity between his alleged complaints and his termination reveals the pretextual nature of AP's stated reasons for terminating him.[105]  But "[t]emporal proximity, standing alone, is not enough" to show pretext.[106]  Donnelly points to no evidence showing that AP's decision to terminate him was based on a protected activity rather than the legitimate reasons AP asserted at the time of his termination.[107]

As a matter of law, Donnelly's retaliation claim cannot succeed.  The Court **GRANTS** AP's motion for summary judgment as to this claim.

### ii.   Johnson

A prima facie retaliation claim requires the claimant to show that "a causal

---

stated that he received the report on November 13, 2018, and that shortly thereafter the Director of HR "signed off on my November 1st decision to terminate Donnelly's employment."  Doc. 79-2 at 227.

[104] Doc. 79-2 at 226.

[105] Doc. 91 at 44.

[106] *Hernandez*, 670 F.3d at 658.

[107] AP's legitimate, nondiscriminatory reason for terminating Donnelly, coupled with Donnelly's inability to show pretext, dispels Donnelly's other generic assertions about other complaints he made during his employment with AP as bases for his retaliation claim.  *See, e.g.*, Doc. 78-1 at 48 (recounting a meeting in which Donnelly claimed to "recall discussing just all incidents, period, from [the] beginning of my tenure," including "personal experiences as they related to" his managers).

link exists between the protected activity and the adverse employment action."[108] Johnson cannot make this showing. She asserts that AP retaliated against her by issuing the Final Written Warning, denying her the promotion to the Partner Support position, and terminating her employment. As discussed, AP's decision not to promote Johnson to the Partner Support position was due to the Final Written Warning, so her retaliatory-failure-to-promote claim is based on AP's alleged retaliation in issuing the Final Written Warning.

The causal link does not exist because Frischkorn, who issued the Final Written Warning and made the decision to terminate Johnson, testified that no one at AP "ever told [him] that Johnson raised any race-based discrimination or unfair treatment allegations."[109]  Johnson does not dispute AP's evidence that Frischkorn was the decisionmaker for her Final Written Warning and her termination, or that he never knew of her protected activity. Since the Final Written Warning directly caused her to lose the Partner Support promotion, the decisionmakers who denied her that promotion are not part of the causal chain; they were merely following set protocol beyond their control. Thus, there is no "causal link" between AP's adverse employment actions and Johnson's protected activity, and her prima facie case fails as a matter of law.

Thus, the Court **GRANTS** summary judgment for AP on Johnson's retaliation claim.

---

[108] *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 367 (5th Cir. 2013).

[109] Doc. 79-2 at 230.

## C. Hostile Work Environment

A prima facie hostile-work-environment claim requires a showing that (1) the plaintiff "belongs to [a] protected class," (2) the plaintiff "was subject to unwelcome . . . harassment," (3) "that the harassment was based on" a protected characteristic, (4) "that the harassment affected a term, condition[,] or privilege of employment," and (5) "that the employer either knew or should have known of the harassment and failed to take prompt remedial action."[110]   Actionable harassment "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[111]   Far from "conduct that sporadically wounds or offends," it must be "so egregious as to . . . destroy [the victim's] equal opportunity in the workplace."[112]

The Supreme Court has defined a standard it characterized as "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[113]   It mapped the following guideposts along the middle path for courts to follow in determining whether, under the totality of the circumstances, a workplace is hostile or abusive: (1) "the frequency of the discriminatory conduct;" (2) "its severity;" (3) "whether it is physically threatening or humiliating, or a mere offensive utterance; and" (4) "whether it

---

[110] *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) (cleaned up).

[111] *Harvill v. Westward Comms., L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (cleaned up).

[112] *DeAngelis*, 51 F.3d at 593.

[113] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

unreasonably interferes with an employee's work performance."[114]

### i. Donnelly

Donnelly's hostile-work-environment claim falls short of these requirements as a matter of law. He bases his claim on the same factual allegations as his discrimination claims. Donnelly experienced what he believed were unwarranted complaints about his work quality and unnecessary, individualized job scrutiny and criticism. But he fails to offer any evidence connecting that to his race. Likewise, Donnelly has failed to introduce any evidence that AP's decision not to promote him was based on his race. Indeed, AP has offered unrebutted, legitimate, and nondiscriminatory reasons it chose not to promote Donnelly, and all the candidates AP ultimately promoted to the positions Donnelly sought were also black.

In Donnelly's own words, AP's failure to promote him "constitutes a critical part of the totality of the circumstances necessary for [his] hostile work environment claim."[115] AP's legitimate, nondiscriminatory reasons for choosing not to promote Donnelly completely discredit this "critical part" of his hostile-work-environment claim. And to the extent Donnelly alleges that AP's failure to promote *other* black employees created a hostile work environment, that claim—especially given the uncontroverted evidence that AP promoted multiple black employees during Donnelly's employment—is not "sufficiently severe or pervasive to alter the conditions of [Donnelly's] employment and create an abusive working

---

[114] *Id.* at 23.

[115] Doc. 91 at 46.

environment."[116]

Standing alone, Donnelly's assertions that AP maintained a racially segregated office also cannot sustain Donnelly's hostile-work-environment claim. Donnelly's segregation allegation is embodied in his assertion that "[e]veryone [at AP] always stated [that] basically the blacks were on the 8th floor and all the whites were upstairs," but Donnelly undermined the implication of segregation by clarifying that "there were blacks upstairs as well."[117]  And evidence that the eighth floor had inferior plumbing to the 9th floor and that eighth-floor employees received leftovers from 9th-floor lunches, even if combined with Donnelly's contradicted segregation claim, is not "so egregious as to . . . destroy [Donnelly's] equal opportunity in the workplace."[118]  And he does not allege that it did.

Finally, Donnelly's claim that a superior described him as an "angry black man" cannot save his hostile-work-environment claim.[119]  As the Supreme Court made clear, the "mere utterance of an epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment to implicate Title VII."[120]  This single comment, as a matter of law, is insufficient to support Donnelly's claim.

---

[116] *Harvill*, 433 F.3d at 434 (cleaned up).

[117] Doc. 78-1 at 86.

[118] *DeAngelis*, 51 F.3d at 593.

[119] Doc. 91 at 11 (citing Doc. 92-10 at 2) (emphasis omitted).  This document consists of an HR employee's notes from a meeting with Donnelly, in which she wrote—with no explanatory notes or context—the following fragments: "try to assist; encouraging / week before venting about issue w/ Rebecca / 'angry black man' / continued to push—others stated acknowledged[.]"  Doc. 92-10 at 2.

[120] *Harris*, 510 U.S. at 21 (cleaned up).

For these reasons, the Court **GRANTS** summary judgment for AP on Donnelly's hostile-work-environment claim.

### ii. Johnson

Johnson alleges that AP created a hostile work environment based on both her sex and her race.  "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."[121]  The Court addresses each in turn.

As to her sex, Johnson claims that AP created a hostile work environment because she "was repeatedly disrespected as a [b]lack female, and she complained [and] was ignored," and because she "was treated differently in compensation than her male co-workers."[122]   The only specific, sex-based "repeated[] disrespect[]" Johnson alleges is an isolated comment from her supervisor—"[W]hat a [*sic*] black girl going to do with all that money when you get that [promotion]?"[123]—which, as discussed, amounts to a "stray remark" that falls far short of a hostile work environment.[124]  And though Johnson says she reported this comment, she did not testify about AP's reaction, if any, to her report.[125]   This isolated incident, even coupled with other generalized allegations lacking record support, is far from repeated, sex-based disrespect, and does not amount to a hostile work environment.

---

[121] *Morgan*, 536 U.S. at 116 n.10.

[122] Doc. 91 at 46–47.

[123] Doc. 78-3 at 156.

[124] *Jackson*, 602 F.3d at 380.

[125] Doc. 78-3 at 156.

Johnson's disparate-compensation allegation also cannot support her hostile-work-environment claim.   It centers around Johnson's 2017 promotion to the Enrollment Manager position.   She testified that "everybody [else] that was getting promoted[] was getting $10,000, and [AP] gave me 6 or 7" thousand dollars.[126]   But of the three AP employees Johnson listed who she believed received a $10,000 pay increase after being promoted, two of the three were women.   She further claims that AP did not permit her to negotiate her salary when it promoted her to the Enrollment Manager position, but that AP permitted two male employees to negotiate their salaries after it promoted them about a year later.   But she never learned what their salaries were.   And when Johnson complained, AP promptly investigated.   AP learned that Johnson received the highest pay-increase percentage of all Enrollment Managers promoted in 2017 and 2018, and that this percentage—12.7%—exceeded the pay increases of the two male employees who Johnson claimed had the chance to negotiate (12% and 11.95%).   Nevertheless, in response to Johnson's complaint—which never mentioned sex or sex discrimination—AP offered Johnson a 4.5% pay increase to address her concerns.

Taken as true, Johnson's allegation that she was unable to negotiate her salary does not demonstrate a "workplace [] permeated with discriminatory intimidation, ridicule, and insult," and it does not constitute "an abusive working environment."[127] Looking to the Supreme Court's guiding factors, this allegation describes a single

---

[126] *Id.* at 123.

[127] *Harris*, 510 U.S. at 21 (cleaned up).

event, not "frequen[t]" conduct, and Johnson does not allege that she was "physically threaten[ed]" or "humiliat[ed]," or that it "interfere[d] with [her] work performance."[128]  As to the final factor, the inability to negotiate salary, especially given AP's genuine attempt to rectify the problem when Johnson complained, does not show "severity" to the level that could save this claim.[129]  Even if AP permitted two men to negotiate their salaries and denied Johnson that chance, Johnson points to no evidence demonstrating that this act was related to gender.  And given that Johnson's pay increase was a greater percentage than these men's, and that AP responded to her complaint by giving her a raise, this allegation cannot alone support Johnson's hostile-work-environment claim.

As to race, Johnson alleges that AP created a hostile work environment due to "the pattern and practice of refusing to promote [her], retaliatory interviews, and refusing to offer [her] a fair chance at promotions for which [she was] qualified," which "over the course of years . . . had the effect of sending a message of inferiority and subordination."[130]

These generalized descriptions are unsubstantiated by the evidence.  Johnson testified that she couldn't remember a time she was unable to perform her job satisfactorily.  In fact, one year into her employment, Johnson wrote, "I love the culture of AP" on a feedback form.[131]  She even referred multiple friends who were

---

[128] *Id.* at 23.

[129] *Id.*

[130] Doc. 91 at 46.

[131] *Id.* at 123.

black to work at AP.[132]  After her termination, she stated that "AP has been a great place to work and grow and I absolutely love . . . AP."[133]

AP promoted Johnson twice during her three-year employment, and several of her supervisors consistently encouraged her to apply and interview for further promotions.  She even declined AP's offer for a third promotion.[134]  And AP chose her to participate in its Emerging Leaders program, its Employee Engagement Focus Group, and its Leadership Development program to help her grow as an employee.  Tellingly, when complaining that she hadn't received a merit increase with her latest promotion, Johnson said, "I've never received an actual merit raise at AP because I always ended up getting promoted right before it was time to get a raise."[135]  AP gave her a raise in response to this complaint.

In the face of this significant evidence of favorable, or at least fair, treatment by AP, Johnson points to only isolated comments, speculation, and generalized assertions lacking record citations.  These cannot create a genuine dispute of material fact that can save her race-based hostile-work-environment claim.

Accordingly, the Court **GRANTS** summary judgment for AP on Johnson's hostile-work-environment claims.

### D. AP's Motion to Strike

AP moves to strike multiple portions of Donnelly and Johnson's response to

---

[132] *Id.* at 175–76.

[133] Doc. 79-1 at 95.

[134] Doc. 78-3 at 128.

[135] *Id.* at 142.

43

AP's motion for summary judgment.

Record citations are the lifeblood of summary-judgment briefing. In summary-judgment briefing, parties must support factual assertions "by [] citing to particular parts of materials in the record" or by "showing that the materials cited [by an adverse party] do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[136]

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[137] Such an objection—in the form of a motion to strike—is the proper path forward when a party believes that evidence submitted in opposition to a summary-judgment motion is inadmissible.[138]

A court ruling on a motion for summary judgment "need consider only the cited materials"[139] in the motion and response. "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."[140] The Federal Rules of Civil Procedure "do[] not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[141]

---

[136] FED. R. CIV. PROC. 56(c)(1)(A)–(B).

[137] *Id.* 56(c)(2).

[138] *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999).

[139] FED. R. CIV. PROC. 56(c)(3).

[140] *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

[141] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (cleaned up).

A court must disregard "inappropriate summary[-]judgment evidence," which occurs when a party's briefing "is replete with inaccurate or misleading factual assertions that are not supported by the evidence."[142]  But the Court is not *required* to strike all improper summary-judgment evidence.  Such an obligation would delay justice and squander judicial resources.  When the Court's ruling does not rely on a given statement in a party's briefing, the Court need not rule on that statement's admissibility.  That is the case for most of AP's objections here, which are now moot.

But some of AP's objections have merit and implicate facts necessary for the Court's summary-judgment analysis.  Accordingly, the Court **GRANTS** AP's motion to strike the following portions of Donnelly and Johnson's response brief:

"*In fact, Ms. Shelton noted that Mr. West described Mr. Donnelly as an 'angry black man.*'"[143]  The Court **STRIKES** this statement because the supporting citation to Shelton's notes from an HR meeting with Donnelly simply states, with no context, the three words "angry black man," with no indication about who spoke the words or why.[144]

"*Donnelly thus applied for a team lead position in July 2017[.]*"[145]  The Court **STRIKES** this statement because (1) the supporting citation to a deposition of one of Donnelly's supervisors states that the witness did not remember when—or if—

---

[142] *Green v. City of Mission*, No. 7:18-CV-49, 2019 WL 3217033, at *8 (S.D. Tex. July 17, 2019).

[143] Doc. 91 at 11 (emphasis added).

[144] Doc. 92-10 at 2.

[145] Doc. 91 at 13.

Donnelly had applied for the position[146] and (2) Donnelly's application for the Team Lead position states the "Date Submitted" as October 16, 2015.[147]

"*In August 2018, Mr. Donnelly complained to Human Resources about [AP's] discriminatory treatment, hiring[,] and promotional practices.*"[148]   The Court **STRIKES** this statement because one of the supporting citations is an email chain from August of 2016 that does not include the complaint described, and the other is the following excerpt from the deposition of Donnelly's supervisor: "Q: Are you aware of a complaint that Raymond Donnelly filed with HR in August of 2018 regarding disparaging treatment and discriminatory hiring [and] promotional practices?   A: No."[149]

"*[Johnson's] supervisor[,] Mr. Twedt, even stated that he did not believe that it was possible for a [b]lack woman to be treated differently than a white man.*"[150]   The Court **STRIKES** this statement because, as noted above, it grossly misstates Twedt's testimony, in which he answered only "I don't know" when repeatedly asked to generalize and compare the workplace experiences of black women and white men.[151]

"*Ms. Johnson then went to Human Resources to submit a complaint and spoke with Mary Ann and Jennifer Shelton and nothing happened.*"[152]   The Court

---

[146] Doc. 92-17 at 10–11.

[147] Doc. 79-2 at 46–49

[148] Doc. 91 at 17.

[149] *Id.* (citing Docs. 92-12 at 2–4; 92-17 at 12).

[150] Doc. 91 at 47.   Johnson repeats this statement elsewhere in her brief, and the Court **STRIKES** that instance of this misrepresentation as well.   *Id.* at 23.

[151] Doc. 79-2 at 117–18.

[152] Doc. 91 at 24.

**STRIKES** this statement because the supporting citation has absolutely nothing to do with the assertion it accompanies.[153]

"*On January 11, 2019, [Johnson] again reported the discrimination to [AP's head of HR] and the retaliatory write-up that she received.*"[154]  The Court **STRIKES** this statement because it is not accompanied by any citation to the record.  Further, as the next sentence of Johnson's brief acknowledges, AP's head of HR testified to the opposite, stating that Johnson did not report discrimination or retaliation during this meeting.[155]

The remainder of AP's objections do not squarely implicate points that are crucial for the Court's summary-judgment analysis, so the Court **FINDS AS MOOT** all other objections in AP's motion to strike.

### E. Sanctions

Donnelly and Johnson request sanctions against AP under Rule 11 or 28 U.S.C. § 1927, arguing that AP's motion to strike was frivolous and filed in bad faith.  As demonstrated by the sections of the motion the Court granted above, AP's motion was not frivolous.  Indeed, the litany of misstatements and outright falsehoods that

---

[153] *Id.* (citing Doc. 92-2 at 33 and specifying an excerpt from Johnson's deposition—269:6–15—which, though it is not reproduced in the brief, states in full: ". . . topics like different conversations. Because I think it's a pretty eye-opening book.  Q: But, and AP bought the book for you and provided it to you?  A: Yes, it was like a group session, yes.  Q: All right.  Do you recall in mid April 2018, Salah, he went by Sal, Eid became your immediate supervisor as the director of enrollment in healthcare vertical? A: Yes.").

[154] Doc. 91 at 30.

[155] Doc. 92-20 at 11 ("Q: Do you recall during that meeting that [Johnson] raised concerns of racial discrimination and [disparate] treatment of black employees?  A: No, absolutely not.  Q: So it's your testimony that that just didn't happen?  A: She did not complain of racial discrimination or disparity in that meeting."); *id.* at 12 ("Q: So when [Johnson] met with you [on] January 11th, 2019, it's your testimony that she never said her final written warning was retaliatory in nature?  A: She never said that to me.").

characterize Donnelly and Johnson's briefing—at best, the product of laziness or inept lawyering, at worst, a flagrant attempt to deceive the Court—thoroughly warrant AP's motion to strike.

Donnelly and Johnson present no reason to believe AP filed its motion to strike in bad faith. Accordingly, the Court declines to impose sanctions under either Rule 11 or 28 U.S.C. § 1927 and **DENIES** the motion.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** AP's motion for summary judgment, **GRANTS IN PART AND FINDS AS MOOT IN PART** AP's motion to strike, and **DENIES** Donnelly and Johnson's motion for sanctions.

**IT IS SO ORDERED** this 14th day of June, 2023.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE